UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TAMARR YOUNG,

                    Petitioner,              **No. 04-CV-00363(VEB)**
                                             **DECISION AND ORDER**

        -vs-

ANTHONY ZON,

                    Respondent.
_____

## I.      Introduction

Represented by counsel, Tamarr Young ("Young" or "Petitioner") has filed a petition for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his

detention in state custody. Young is serving a determinate sentence having a maximum of 20

years as the result of a judgment of conviction entered against him in Erie County Court,

following a jury trial, on one count of attempted murder in the second degree (New York Penal

Law ("P.L.") §§ 110, 125.25(1)), two counts of assault in the first degree (P.L. §§ 120.10(1),(3)),

one count of reckless endangerment in the first degree (P.L. § 120.25), and one count of criminal

possession of a weapon in the second degree (P.L. § 265.03).

The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1).

For the reasons that follow, Young's request for a writ of habeas corpus is denied and the

petition is dismissed.

## II.     Factual Background and Procedural History

## A.    State Court Proceedings

### 1.    The Trial

The conviction here at issue arose from a shooting incident in the City of Buffalo on November 8, 1998. At about 3:15 a.m. on November 8, 1998, Preston Lemon ("Lemon") looked out the front window of his house at 18 Grey Street and saw Petitioner's car across the street. Petitioner was looking at him through his (Lemon's) window. T.102, 103, 104. According to Lemon, Petitioner then drove off.  Lemon and Petitioner had quarreled two days earlier. Petitioner had not fared well in the fight and he vowed revenge, telling Lemon that he would be back "to blow up all you MF's". T.96, 100.

Petitioner returned to 18 Grey Street a short time later.  According to passengers who were in the car with him, Petitioner fired five shots from a .44-magnum Smith and Wesson revolver into the front window of the house. Lemon ran to his window after the shots were fired and saw Petitioner's car pulling away. T.108. Jamie Brooks ("Brooks" or "the victim"), who had been visiting, was standing in front of the window and was hit in the stomach by a bullet. Brooks sustained serious injuries and spent the next two months in the Erie County Medical Center where he underwent several surgeries in April 1999. Lemon, the intended victim, escaped from the incident unharmed.

At trial, Pinky Stover ("Stover") testified that he was a passenger in Petitioner's car on the night of November 8th. While they were on Grey Street, Petitioner stopped the car and got out. Seconds later, Stover heard several shots fired. After that, Petitioner returned to the car. T204-206. When Stover asked Petitioner what was going on, Petitioner, replied "Some bull shit. I handled it." T.206. Stover recalled that Young was toting a "huge .44" when he returned to the

car.

Following his arrest, Stover had two conversations with Young in which Young told him that the wrong person had gotten shot and that he should tell the police that Adrian Lias ("Lias") was the shooter. T.214.

At trial, Lias corroborated Stover's version of the events, adding that Young handed him a gun during the ensuing police chase which he (Lias) threw out of the window. Lias testified that Young urged him to tell the police that Stover was the shooter. T.314.

Dr. Kurt Von Pricken outlined Brooks' life-threatening injuries and the six operations he performed on Brooks during his two month stay in the hospital. T.471- 493.

Jailhouse informant Robert Culotta told the jury of his conversation with Young while they were both being held at the Erie County Holding Center. According to Culotta, Young admitted that he shot someone with a .44 magnum handgun. Young also explained to Culotta that he had gotten a black eye when the victim's friend had punched him. T.523.

Brooks, via videotape, related that he had been visiting Lemon at 18 Grey Street on the night of November 8, 1998. While standing in front of Lemon's front window, he was shot in the abdomen by a person whom he did not see. T.508-509, 515. Brooks also testified about the injuries he sustained and the surgeries he underwent.

Bert Pandolfino, a firearms examiner for the Erie County Central Police Services laboratory, T.445, testified that the gun recovered in this case was an operable Smith & Wesson .44 Magnum six-shot revolver, T.450-51. The spent bullets recovered from 18 Gray Street were .44-caliber bullets. T.453-54. The firearms examiner opined that the spent bullets were consistent with having been fired from the recovered .44 Magnum revolver. T.457-59. The five cartridge

cases recovered in this case were positively identified as being fired from the weapon used in the shooting on Gray Street. T.459-70.

Prior to the conclusion of the prosecution's case, defense counsel informed the trial court that he wished to cross examine case Detective Charles Wilson about the contents of a gun shot residue ("GSR") test performed on Petitioner, Pinky Stover and Adrian Lias. The report produced by the prosecution indicated that gunshot residue was present on the hands of both Stover and Lias but not Petitioner. T.418-19. During a colloquy with the court, the trial prosecutor, Assistant District Attorney ("A.D.A.") Brian Mahoney, Esq., for the first time disclosed that while Detective Wilson had taken the samples from Petitioner, Lias and Stover, the actual testing had been performed by a private out-of-state laboratory retained by the Erie County District Attorney's Office. T.419. In addition, the prosecutor stated that the items of clothing taken from Petitioner, Lias, and Stover had not been tested, although they had been sent, with the swabbings to the lab. There were no test results from the clothing, accordingly. Furthermore, the prosecutor had no report or letter indicating that testing on the clothing had *not* been performed. However, this did not appear to have been an issue for defense counsel.

In any event, with regard to the GSR testing, defense counsel stated that he had assumed that the person who signed the report would be called by the prosecution at trial and therefore he had not subpoenaed him. A.D.A. Mahoney stated that he did not intend to produce a representative of that firm because, he asserted, he had no obligation to produce an expert for the defense. A.D.A. Mahoney objected on hearsay grounds to defense counsel eliciting the outside lab's test results from Detective Wilson. T.420-23. The trial court, obviously frustrated with A.D.A. Mahoney's gameplaying, ordered the prosecution to produce someone from the lab by

the following Monday. Justice Forma, the trial judge, stated that if it did not, the defense would be permitted to have the GSR test results read to the jury. T.423-24.

Detective Wilson testified that he did, in fact, take swabbings from Petitioner, Lias, and Stover to determine whether there was any gunshot residue on them. T.430, 433. Those samples, as well as each suspects's clothing items were sent to an out-of-state lab for analysis. T.439-40. Wilson received the results from the swabbings but could not recall seeing any gunshot residue test results for the clothing. T.440.

The lab representative was not produced the following Monday. Instead of that testimony, the parties stipulated to test results being read into the record as follows:

> It has been stipulated between the parties that on the morning in question, Detective Charles Wilson took samples of particles found on all three individuals who were arrested hands and submitted samples to a private laboratory in Pennsylvania for analysis…

> Conclusion: Young, comma Tamarr, there were no particles classified as unique to GSR detected in the sample set. It is termed inconclusive. This does not eliminate the possibility that the particles detected were the result of discharging a firearm, handling a contaminated weapon or being in the immediate proximity of a discharged firearm.

> Conclusion, Stover, comma, Pinky, the particles found on the hand samples of Pinky Stover could have resulted from the discharge of a firearm or from handling a contaminated firearm or being in close proximity of a discharged firearm or some other form of contamination.

> Conclusion: Lias, comma, Adrian, particles found on the hand samples of Adrian Lias could have resulted from the discharge of a firearm or from handling a contaminated firearm or being in close proximity of a discharged firearm or some other form of contamination.

T.545-46; see also Exhibit 1 (Docket No. 24-1) attached to the Declaration of Robert J. Boyle, Esq. ("Boyle Decl.") (Docket No. 24).

Trial counsel called one witness for the defense, Louise Young, Petitioner's grandmother.

Mrs. Young's testimony was directed against both Stover and Lias who both had testified that they had seen petitioner in possession of the .44 Magnum in question a few weeks prior to the shooting while at Mrs. Young's house. T.218, 221-29, 384-85. Mrs. Young testified that she knew both Stover and Lias and that it had been over two years since they were at her house. T.566-68. Thus, the defense argument was that Lias and Stover were lying when they stated that they had been at Petitioner's grandmother's house a couple of weeks before the shooting.

The jury returned a verdict convicting Young as charged in the indictment. He was sentenced to a determinate term of 20 years in prison.

### 2. Post-Sentencing Proceedings

Young, represented by new counsel, appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. Young also submitted a *pro se* supplemental appellate brief. The Fourth Department unanimously affirmed the conviction. *People v. Young*, 298 A.D.2d 952, 953, 748 N.Y.S.2d 108 (App. Div. 4th Dept. 2002). Leave to appeal to the New York Court of Appeals was denied.

Young, acting *pro se*, filed a motion to vacate the judgment pursuant to C.P.L. § 440.10 in the trial court in 2003. His primary argument was that trial counsel had been ineffective in failing to properly advise him concerning whether to accept or reject a plea offer. The trial judge declined to hold an evidentiary hearing and denied the motion in a written decision and order.

### B. The Federal Habeas Petition

This timely habeas petition followed. The operative pleading before the Court is Young's amended petition, to which Respondent has submitted an Answer and Memorandum of Law. (Docket Nos. 19 (Response) & 20 (Memorandum of Law)). Young's attorney filed a Reply

Memorandum of Law. (Docket No. 25).

The amended petition asserts the following grounds for relief: (1) trial counsel was ineffective in failing to recommend whether Young should or should not accept an alleged plea offer; (2) trial counsel was ineffective in waiving the requirement of C.P.L. § 660.40 that the prosecutor file a written notice of a request for conditional examination of a witness; (3) the verdict was against the weight of the evidence; and (4) the prosecution failed to disclose exculpatory evidence in the form of a report regarding gunpowder residue.

For the reasons that follow, the petition is granted in part and denied in part.

## III.    Standard of Review

Federal habeas review is available for a State prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Errors of state law are not subject to federal habeas review. *E.g.*, *Estelle v McGuire*, 502 U.S. 62, 67-68 (1991); *Cupp v Naughten*, 414 U.S. 141, 146 (1970).

Because Young's petition, filed in 2004, postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered titles of the U.S.C.), AEDPA's revisions of 28 U.S.C. § 2254 govern the proceeding. *Lurie v. Wittner*, 228 F.3d 113, 120-21 (2d Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000); *Lindh v. Murphy*, 521 U.S. 320, 322-23, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir.1998). The Second Circuit has summarized the requirements placed upon a habeas petitioner by the AEDPA standard as follows:

Under AEDPA, to prevail on a petition for a writ of habeas corpus, a petitioner

confined pursuant to a state court judgment must show that the court's
"adjudication of the claim ... resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).
"[C]learly established Federal law" refers to holdings of the Supreme Court, as
opposed to dicta, as of the time of relevant state court decisions. *Carey v.
Musladin*, 549 U.S. 70, 74-75, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Williams
v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision
is "contrary to" federal law "if the state court arrives at a conclusion opposite to
that reached by [the Supreme Court] on a question of law or if the state court
decides a case differently than [the Supreme Court] has on a set of materially
indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. An
"unreasonable application" occurs when a "state court identifies the correct
governing legal principle ... but unreasonably applies that principle to the facts of
the [petitioner's] case." *Id.* "Unreasonableness is determined by an 'objective'
standard." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005) (quoting
*Williams*, 529 U.S. at 409, 120 S.Ct. 1495)..

*Friedman v. Rehal*, 618 F.3d 142, 152-153 (2d Cir. 2010) (Korman, D.J., sitting by designation)

The Supreme Court has stated that "unreasonableness" should not be conflated with "clear error"

because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v.

Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). "[A] federal habeas court is

not empowered to grant the writ just because, in its independent judgment, it would have decided

the federal law question differently. The state court's application must reflect some additional

increment of incorrectness such that it may be said to be unreasonable." *Aparicio v. Artuz*, 269

F.3d 78, 94 (2d Cir.2001). However, "the increment need not be great; otherwise, habeas relief

would be limited to state court decisions so far off the mark as to suggest judicial incompetence."

*Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks

omitted).

"[A] 'state court adjudicates a state prisoner's federal claim on the merits when it (1)

disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " *Jimenez v.*

*Walker*, 458 F.3d 130, 142 (2d Cir.2006) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001) (quotation and alteration marks omitted)). Where a claim has been "adjudicated on the merits," 28 U.S.C. § 2254(d), "deference [is] mandated under AEDPA," *Sellan*, 261 F.3d at 310, in the federal habeas court's review of petitioner's claim. All of Young's claims have been adjudicated on the merits by the state courts.

## IV. Analysis of the Second Amended Petition

### A. Ground One: Ineffective Assistance of Trial Counsel – Failure to Advise Regarding Plea Offer

Young asserts that trial counsel failed to "offer his informed opinion as to whether a plea should be entered" and instead informed Young that "it was not his policy to recommend to his client whether a sentence [sic] offer should be accepted or rejected." Second Amended Petition, ¶22(A) (Docket No. 11); *see also* Letter from Alan Goldstein, Esq. dated 10/24/02, to Petitioner ("When the possible sentence carries with it a significant period of incarceration, I usually did not make any recommendation to accept or not. Now, with recent case law, I will make a recommendation to assist the Defendant in making his decision."), attached as part of Respondent's Appendix of Exhibits.

#### 1. State Court Proceedings

This claim was raised in support of Young's first C.P.L. § 440.10 motion dated May 7, 2003. Young moved to vacate his conviction on the ground of ineffective assistance of counsel, alleging that he was informed by counsel, Alan Goldstein, Esq., that the prosecution had extended a "sentence offer" with a maximum of seven years in exchange of a plea of guilty. Petitioner did not specify the charges to which he would be required to allocute in order to

receive the alleged sentence promise of seven years. Petitioner claimed that counsel failed to advise him whether to accept or reject the offer because trial counsel wished to proceed to trial to enhance his fee. Petitioner also claimed that had he "been advised of his precarious position," he would have accepted the seven year sentence offer, rather than risk exposure to a 25-year sentence.

In support of his C.P.L. § 440.10 motion, Young attached (1) his affidavit; (2) an affidavit from his father, Thomas Young; (3) a letter dated September 3, 2002, from Young to trial counsel; and (4) a letter dated October 24, 2002, from trial counsel to Young.

### a.    Petitioner's Affidavit

In his C.P.L. § 440.10 Affidavit ("Pet'r C.P.L. § 440.10 Aff."), Young stated that "[d]uring the course of the proceedings, [he] was informed by counsel that the People had made a sentence offer with a maximum of 7 years in exchange for petitioner's plea of guilty." Pet'r C.P.L. § 440.10 Aff., ¶4. He stated that he "rejected the offer as a direct result of counsel breaching his duty to properly advise petitioner whether the sentence offer appeared desirable." *Id.* Instead, Young asserts, trial counsel "conveyed to petitioner the impression that trial was the best course to pursue for a dismissal of the case" because of "a suspected personal agenda" on counsel's part–namely, increasing his attorney's fee by $5,000. *Id.*, *see also id.*, ¶¶ 3, 6. Young states "affirmatively" and "[w]ithout reservations," that "had he been properly advised of his precarious position, he would have accepted the sentence offer of seven-years, rather than risk exposure to the more severe sentence of twenty-years." *Id.*, ¶7.

### b.    Petitioner's Father's Affidavit

In his Affidavit, Petitioner's father, Thomas Young, stated that after Petitioner's his

November 7, 1998 arrest, the family retained Alan Goldstein, Esq. to represent him. The retainer provided that if the case were disposed prior to trial, the fee would be Two Thousand Five Hundred Dollars ($2500.00) and if it proceeded to trial, their would be additional fee of Five Thousand Dollars ($5000.00) for a total fee of Seven Thousand Five Hundred Dollars ($7500.00). Affidavit of Thomas Young sworn to April 23, 1998, Ex. A to C.P.L. § 440.10 Aff.

Petitioner's father did not mention anything about the alleged plea offer in his affidavit.

### c.    Petitioner's September 3, 2002 Letter to Trial Counsel

On September 3, 2002, Petitioner "made a formal request to counsel asking to be provided a detailed account of his independent investigations and the extent of advice he offered petitioner in deciding to reject the sentence offer." Petitioner's Letter dated 9/3/02 to Trial Counsel ("Pet'r Letter"), Exhibit ("Ex.") B to C.P.L. § 440.10 Motion.

### d.    Trial Counsel's October 24, 2002 Letter to Petitioner

On October 24, 2002, Attorney Goldstein responded to Young's letter of September 3rd, stating,

> [I]n response to your letter, as I recall, you were never interested in a plea, having maintained your innocence. *As to any plea offered,* it is always presented to the Client for either approval or rejection. *When the possible sentence carries with it a significant period of incarceration, I usually did not make any recommendation to accept or not.*
>
> *Now, with recent case law, I will make a recommendation* to assist the defendant in making his decision. But, the final decision is always up to the client.
>
> I hope that this will assist you in some way, but I can offer no further specific information on your case.

Letter of Attorney Goldstein dated 10/24/02 to Petitioner ("Goldstein Letter"), Ex. C to C.P.L. § 440.10 Motion (emphases supplied), attached as part of Respondent's Appendix of Exhibits.

Petitioner's habeas counsel characterizes this letter as stating that "Mr. Goldstein did not dispute that there was an offer of seven years" but "[r]ather, he simply stated that it was his recollection that petitioner was not interested in a plea." Pet'r Mem. at 13 (Docket No. 25).

Further complicating the matter is a passage in the beginning of Young's September 3rd letter to Attorney Goldstein. In particular, Young stated, "[i]n response to your [i.e., trial counsel's] letter dated June 24, 2002, . . . contrary to your own faulty memory of this particular and essential issue, my vivid recollection is that the *sentence offer* conveyed to me was a *maximum of seven-years*." Pet'r Letter, Ex. B to C.P.L. § 440.10 Motion. Two inferences are possible from the sentence quoted above from Attorney Goldstein's June 24, 2002 letter–that Attorney Goldstein disagreed that the plea offer extended had a seven-year sentence cap and instead had a longer sentence, or that Attorney Goldstein disagreed that there had been any plea offer extended at all. Petitioner has not submitted the June 24, 2002 letter from Attorney Goldstein to the Court; nor did he submit it to the C.P.L. § 440.10 Court. After reading all of the available documentation, as discussed further below, this Court concludes that the most reasonable reading is that the essential point of disagreement was the length of the sentence conveyed as part of the plea offer–not the existence *vel non* of a plea offer.

### e. Respondent's Opposition Affidavit

In opposition to Young's C.P.L. § 440.10 Motion, A.D.A. Donna Milling, Esq. submitted an affidavit pointing out that Young did not state when the offer was made or the charges to which he would have been entering a guilty plea. Affidavit of A.D.A. Donna Milling, Esq. ("Milling Aff."), ¶8. Their reply did not include an affidavit from anyone with personal knowledge of the prosecution. A.D.A. Milling also stated that she had "reviewed the contents of

the District Attorney's [file], the Court's file and the transcripts of pre-trial proceedings and can find no indication of any plea offer in these records where such an offer would normally be noted." *Id.*, ¶9. Accordingly, the People argued, Young had failed to demonstrate that a plea offer was extended to him and counsel was ineffective for failing to properly advise him in this regard. *Id.*, ¶12. As Petitioner's habeas counsel points out, A.D.A. Milling did not speak with anyone from the Erie County District Attorney's having personal knowledge of the Young prosecution, including any off-the-record plea discussions that may have taken place, such as the two trial assistants, Brian C. Mahony, Esq., and Lynn Marie Wessel, Esq. *See* Pet'r Mem. at 15-16 (Docket No. 25).

### f.      The County Court's Decision and Order

The C.P.L. §440.10 motion was denied in a decision and order entered on July 29, 2003, by Justice Forma, the trial judge. Notwithstanding that Petitioner had submitted an affidavit stating that there was a plea offer and the District Attorney failed to dispute his account with an affidavit from someone with personal knowledge, the trial court held that petitioner had failed to prove that an offer was, in fact, made. Justice Forma stated,

> The court finds that the defendant's claim [regarding the plea offer] to be without merit. He provides absolutely no independent support, such as an affidavit from his attorney, for the proposition that the People agreed to resolve this matter by plea. Moreover, the defendant's version of the events surrounding the shooting as well as Mr. Goldstein's letter (Exhibit C) suggest that the defendant maintained his innocence and wished to go to trial. In short, the defendant's motion appears to be an exercise in hindsight and provides no reasonable basis to conclude that counsel failed to provide the meaningful representation to which defendant was entitled (*People v. Baldi*, 54 N.Y.2d 137, 147).

C.P.L. § 440.10 Decision & Order, at p.2, attached as part of Respondent's Exhibit submitted in connection with the instant proceeding. A timely application for leave to appeal to the Appellate

Division, Fourth Department was denied.

**2.    Habeas Review**

   **a.    Additional Evidence of Plea Offer – Letter of Emily Trott, Esq. to Petitioner dated March 7, 2007**

During the pendency of this habeas proceeding, Young obtained a letter dated March 7, 2007, from Emily Trott, Esq., the attorney associated with Attorney Goldstein who second-chaired at Young's trial. *See* Letter from Emily Trott, Esq., dated 3/7/07 to Petitioner ("Trott Letter"), attached to Boyle Decl. (Docket No. ) as Ex. . Attorney Trott states that she "prepped the case" for Attorney Goldstein and "remembered it all." *Id.* With regard to the plea offer, she states as follows:

> *There was a plea offer extended, though the length is unclear to me. It was either 7, 10 or 12 years. I extended to [sic] offer to you and your dad and we discussed it in Mr. Goldstein's office on a Saturday morning*. I told you that you might need to testify and the dangers that came with that. We decided that you would not testify if you declined the plea, and that with Mr. Goldstein's experience and courtroom prowess, you would go to trial as a wrongly accused man.

. . .

Trott Letter (Exhibit 5 (Docket No. 24-5) to Boyle Decl. ( Docket No. 24) (emphasis supplied)). Attorney Trott goes on to discuss the issue concerning the gunshot residue test results and to criticize Attorney Goldstein's closing argument.  There is no further discussion in the letter concerning the plea offer or the discussions she had with Young and his father at this meeting. *See id.*

Respondent's attorney submitted a Declaration in Opposition, pointing out that the Trott Letter has been produced for the first time in this Court.  Respondent's attorney points out that Attorney Trott admitted Young's trial was "not her case," and notes that her letter was "vague

concerning the alleged plea offer" since Attorney Trott "was unable to remember if the **sentence** was '7, 10 or 12 years,' and does not tell petitioner that the court made a sentence commitment." Milling Decl., ¶5 (emphasis in original). As Respondent's attorney also points out, "despite petitioner's father being present at the 'plea offer' discussion, he has not supplied an affidavit concerning his recollection of the meeting." *Id.* By the same token, Respondent still has not provided an affidavit or statement from anyone with personal knowledge of the Young prosecution to refute the assertions of Petitioner and Attorney Trott or the implicit admission of Attorney Goldstein that there was a plea offer.

**b.     Applicable Legal Principles**

Under the performance prong of the *Strickland v. Washington ,*466 U.S. 668 (1984), standard, trial counsel "must give the client the benefit of counsel's professional advice on [the] crucial decision of whether to plead guilty." *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir.2000) (internal quotation marks omitted) (quoting *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir. 1996)).

Indeed, the Supreme Court has recognized that the informed advice of counsel on whether to plead guilty

> is one of the basic functions of defense counsel: "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." In fact, the Supreme Court had held that a defendant "requires the guiding hand of counsel at every step in the proceedings against him."

*Carrion v. Smith*, 644 F. Supp.2d 452, 466 (S.D.N.Y. 2009) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948) ("[A]n accused is entitled to rely upon his counsel . . . to offer his informed

opinion as to what plea should be entered.") *and Powell v. Alabama*, 287 U.S. 45, 69 (1932)),

*aff'd* No. 09-3717-pr, 365 Fed. App. 278, 2010 WL 457326 (2d Cir. Feb. 11, 2010 . In order to

provide representation that is within the bounds of prevailing professional norms, trial counsel

has a duty to correctly advise a defendant with respect to the applicable facts and law that would

be necessary for the defendant to make an informed decision about whether to accept a plea offer

or go to trial. *Von Moltke v. Gillies*, 332 U.S. at 721; *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir.

2005); *Mask v. McGinnis*, 233 F.3d 132 (2d Cir. 2000); *Boria v. Keane*, 90 F.3d 36 (2d Cir.

1996).

This requires, at a minimum, that "counsel . . . communicate to the defendant the terms of

the plea offer, and should usually inform the defendant of the strengths and weaknesses of the

case against him, as well as the alternative sentences to which he will most likely be exposed."

*Id*. at 45 (internal citations omitted). Defense counsel 'must give the client the benefit of

counsel's professional advice on this crucial decision' of whether to plead guilty." *Id.* at 45

(quoting *Boria*, 99 F.3d at 497 ((quoting Anthony G. Amsterdam, Trial Manual 5 for the Defense

of Criminal Cases (1988)) (emphasis omitted in *Purdy*)) and citing *Cullen v. United States*, 194

F.3d 401, 404 (2d Cir. 1999) ("*Boria* recognizes a lawyer's general duty to advise a defendant

concerning acceptance of a plea bargain."); Model Rules of Professional Conduct Rule 1.4(b)

(1995) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to

make informed decisions regarding the representation.")).

The Second Circuit has explained that "[a]s part of this advice, counsel must

communicate to the defendant the terms of the plea offer[.]" *Purdy*, 208 F.3d at 45 (citing *Cullen*,

194 F.3d at 404). Trial counsel "should usually inform the defendant of the strengths and

weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed," *id.* (citing *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998)), because "knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty[,]" *Gordon*, 156 F.3d at 380) (internal quotation marks omitted); other citations omitted)).

In some tension with the attorney's duty to give a defendant the benefit of his or her professional advice about pleading guilty are rules of conduct placing on the attorney an "'affirmative duty to avoid exerting "undue influence on the accused's decision" and to "ensure that the decision [whether to enter a guilty plea] . . . is ultimately made by the defendant."'" *Purdy*, 208 F.3d at 45 (quoting *Jones v. Murray*, 947 F.2d 1106, 1110-11 (4th Cir. 1991) (quoting American Bar Association Standards for Criminal Justice 4-5.1(b) & 14-3.2(b))).

### c.    Analysis of Petitioner's Ineffective Assistance Claim

Three questions must be answered in the resolution of whether trial counsel was ineffective in failing to properly advise Young regarding a plea offer. First, the Court must determine that there was, in fact, a plea offer extended by the prosecution. Second, the Court must determine whether trial counsel fulfilled his obligations under the Sixth Amendment with regard to the plea offer or whether his performance fell below an objective standard of reasonableness gauged against prevailing professional norms. Third, the Court must determine if Young was prejudiced, that is, it must make "the determination of the likelihood that [the petitioner] would have accepted the plea bargain if he had been fully informed of its terms and accurately advised of the likely sentencing ranges under the plea bargain and upon conviction after trial was." *Cullen*, 194 F.3d at 405. "[L]ike all predictions of what might have been," this is

"a factual issue, albeit a hypothetical one." *Id.*; *accord Carrion*, 365 Fed.Appx. at 283, 2010 WL 457326, at **4 (affirming district court's grant of habeas relief based upon ineffective assistance of counsel for failure to properly advise regarding a plea offer).

### 1.) Whether a Plea Offer Was Extended to Petitioner

Respondent argues that trial counsel was not ineffective in failing to advise Young about the costs and benefits of a plea deal because there was no plea offer communicated by the prosecutor to the defense. Respondent contends that it is problematic for Young's claim that the only term identified is an alleged sentence promise by the prosecutor of seven years. Respondent argues that because the length of a defendant's sentence is within the discretion of the court, and there is no indication that the trial court was involved in the alleged plea offer, such an offer arguably was unenforceable.

In denying C.P.L. §440.10 relief the state court found that Young had not established that an offer had been made and, alternatively, would not have accepted the offer because he maintained his innocence. Petitioner argues that both conclusions are unreasonable for the following reasons. First, in their C.P.L. §440.10 opposition papers, the District Attorney's Office failed to submit an affidavit from anyone with personal knowledge of Young's prosecution, including what, if any, plea discussions took place prior to trial. Rather, the assertion that there was no formal offer is based solely upon a second-hand review of the file and court transcripts by the assistant district attorney handling the appeal; she was not involved in the trial proceedings. Petitioner's habeas counsel accurately notes that plea discussions often occur during off-the-record discussions in court or during even more informal conversations out of court. Thus, Petitioner argues, that no "formal" offer was allegedly noted in the District Attorney's files or

conveyed on-the record during a court appearance is not dispositive of whether there were plea offers or discussions among the parties and/or the court. I find this argument persuasive.

Second, Petitioner asserts, Attorney Goldstein did not dispute that a plea deal with a seven-year cap was offered by the prosecution and, indeed, his 2002 letter avoided that issue altogether. I agree with Petitioner that Attorney Goldstein's letter assiduously avoids the issue of whether there was a plea. His phraseology is entirely ambiguous and, in this Court's opinion, designed to obfuscate his deficient performance in failing to counsel Young about the plea, as discussed further below.

Respondent argues that Petitioner's affidavit should be discredited because the prosecution could not have made a "sentence" offer of seven years since it is the court, and not the parties that determines a sentence (Respondent's November 19, 2010 Memorandum of Law, p. 6). I agree with Petitioner's habeas counsel that Respondent's argument ignores day-to-day practice in the New York State criminal justice system: Plea negotiations first involve discussions between the parties and, in the New York State system, it is not unusual for there to be an agreed-upon sentence if a plea agreement is reached between the defense and the prosecution. The court then is presented with the plea agreement and agreed-upon sentence for its approval. In Young's case, a plea agreement was never presented to Justice Forma because an agreement between the parties was never reached. However, that does not mean that a plea offer was never conveyed or would not have been approved if presented to the trial court.

Third, Petitioner asserts, Attorney Trott, a former employee of Attorney Goldstein who assisted him at Young's trial, has stated that an offer was made and that she conveyed it to Young and his father. I agree and find that Attorney Trott's letter is corroborated by the trial

record. Specifically, Attorney Trott stated that the plea offer of "7, 10 or 12" years was conveyed by her to Young and his father on a Saturday at Attorney Goldstein's office. Attorney Goldstein apparently was not present at this meeting. *See* Trott Letter.

On April 12, 1999, which was a Monday,[1] the trial judge commented,

So now we are going to conduct our pre-voir dire conference. *Miss Trott advised no plea was possible* so I ordered sixty jurors. They should be on their way down here and that's why we are in Chambers. . . .

Transcript of Pre-Voir Dire Conference and Motions, dated April 12, 1999 ("Pre-Voir Dire Tr.") at 4 (emphasis supplied). At the time, Attorney Goldstein was present in court with Petitioner; Attorney Trott was covering another matter before a different judge. Nothing further was mentioned by any of the attorneys present.

These two items (i.e., the Trott Letter and Justice Forma's comment at the April 12th conference), read in tandem, support a finding that there was a plea offer of some kind extended in this matter prior to the commencement of jury selection. The Court finds it extremely unlikely that a defense attorney would tell a trial judge that "no plea was possible" if there had not been any plea discussions prior to that point. It is unlikely that the trial judge would refer to defense counsel's statement about a plea not being possible if there never had been any plea discussions between the parties.

Respondent's attorney questions the existence of a plea. Respondent notes that although Attorney Trott states that Petitioner's father was present at the Saturday meeting, Petitioner's

_____

[1]    *See* http://www.timeanddate.com/calendar/?year=1999&country=1 (last accessed February 10, 2011)

father's affidavit confines itself to reciting the terms of the retainer agreement and does not contain any mention about the plea that Attorney Trott states she conveyed to Petitioner.

The Court finds it telling that respondent has never contacted either of the trial assistants, A.D.A. Mahoney and A.D.A. Wessel, so as to be able to present the courts with information from a person with knowledge about Young's criminal prosecution and any off-the-record plea discussions. There is no indication from respondent's attorney that either of the trial prosecutors have left the District Attorney's Office–of which respondent's attorney is also an employee, and was an employee at the time of Young's direct appeal. It certainly would not have been difficult for respondent's attorney to secure an affidavit from one of the trial prosecutors. The fact that she has not done so further strengthens this Court's suspicion that they would not confirm the non-existence of a plea offer.  After all, if the prosecutors had helpful information for respondent, one would expect respondent's attorney to obtain a statement putting the issue to bed.

After considering all of the documentation available, the Court concludes that Young has demonstrated by clear and convincing evidence that there was a plea offer extended. Justice Forma's comment on a Monday that "Ms. Trott advised that a plea was not possible" corroborates Attorney Trott's statement in her letter that she conveyed a plea offer to Young and his father on a Saturday. The Court recognizes that  she was unsure in her recollection of the length of the sentence offered, but she did state that it was either seven, ten, or twelve years. Attorney Goldstein did not dispute the existence of a plea offer; at most he disputed that the maximum sentence offered was seven years.  In this particular case, whether the sentence offer was seven, ten, or twelve years has become immaterial, because Young has already served over eleven years of his twenty-year sentence. Had he accepted a plea to twelve years, he would have

already been eligible for parole several years ago, and his maximum expiration date would be October 27, 2011.

Having concluded that a plea offer was on the table at some point during Young's criminal prosecution, and that it was communicated to Young, the Court now proceeds to evaluate the quality of the representation afforded to Young in regards to whether to accept or reject the plea.

### 2.) Deficient Performance With Regard to Plea Offer

"Defense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir.2003) (citing *Boria v. Keane*, 99 F.3d at 498 *United States v. Gordon*, 156 F.3d 376, 379-80 (2d Cir.1998) (*per curiam*)). To the extent that Attorney Goldstein failed to offer any recommendation about whether to take the plea, he was ineffective. Indeed, Attorney Goldstein implicitly acknowledges as much when he notes that in light of unspecified "recent case law" he "now" "will make a recommendation to assist the Defendant in making his decision" about pleading guilty. Goldstein Letter, Ex. C to Pet'r C.P.L. 440.10 Motion, Respondent's Appendix of Exhibits. It is extremely troubling that Attorney Goldstein "usually" withheld giving advice *especially* when the potential sentence was "significant"–a situation where the defendant is arguably in the most need of an attorney's professional recommendation.

In sum, I find that Attorney Goldstein breached his Sixth Amendment duty to provide effective assistance given his conceded and absolute lack of advice to Young concerning the plea offer. *See Carrion v. Smith*, 644 F. Supp.2d at 468 ("While representation may be an art, *see*

*Purdy*, 208 F.3d at 45, a blank canvass [sic] does not constitute a picture, much less art."), *aff'd*,

Petitioner was charged with two class B violent felonies, a class C violent felony and a class D felony, in connection with his firing of a handgun into a home where an unarmed man (not the intended target of the shooting) suffered serious physical injury. Trial counsel was confronted with a case where his client (1) was positively identified by Preston Lemon, with whom had a previous encounter about a week before the crime, as being present at 18 Gray Street a short time before the shooting; (2) was arrested shortly after the shooting following a police chase; (3) was then identified by two friends, Stover and Lias, as the shooter and; and (4) made statements to a jailhouse informant, Richard Culotta admitting his involvement in the shooting. Lias, one of the passengers in the car Young was driving, testified that Young shot into the home and then gave him the gun to throw out the window as they fled the scene Both of Young's companions on the night of the incident testified that, after their arrests, Young approached each of them told them to inculpate each other–that is, he told Lias to accuse Stover of being the shooter, and vice versa. In addition, Lemon–the intended victim–testified that Petitioner had a motive to harm the occupants of 18 Gray Street after the physical confrontation Petitioner had with Lemon and his guests a few days prior to the shooting, at which Petitioner threatened to come back and "blow up all of them MF's". Although gunshot residue results for Young indicated that there were "no particles classified as unique to GSR detected" and therefore "inconclusive", such results did "not eliminate the possibility that the particles detected were the result of discharging a firearm, handling a contaminated weapon or being in the immediate proximity of a discharged firearm." GSR Report, Ex. 1 (Docket No. 24-1) to Boyle Decl. (Docket No. 24). The absence of "unique GSR" residue could be explained–as the prosecution argued–by

Lias's testimony that Young was wearing knit gloves during the shooting and discarded them during the car chase.

Given the facts of this case, trial counsel's performance clearly failed to conform to the minimum professional norms in that he utterly failed to give Young any advice about the plea offer. I agree with Petitioner's habeas counsel that this case is similar to *Boria v. Keane*, in which the defendant had been charged with a Class A-1 drug felony and faced a sentence of twenty-five years to life. He was offered a plea whereby he would serve no more than one to three years. Counsel communicated the offer but the defendant rejected it apparently because he feared the embarrassment of pleading guilty in front of his children. The Second Circuit held that trial counsel's failure to offer *any* advice concerning the plea bargain was constitutionally inadequate under the particular facts of that case. "Effective assistance of counsel", said the Court, "includes counsel's informed opinion as to what pleas should be entered." *Id.* at 497.

Young was denied effective assistance of counsel because Attorney Goldstein delegated the responsibility to an associate to communicate the plea offer and provided *no* recommendation about the pros and cons of accepting the plea. Attorney Goldstein stated in his October 24, 2002 letter, "As I recall, you [Young] were never interested in a Plea, having maintained your innocence. As to any Plea offered, it is always presented to the Client for either approval or rejection. *When the possible sentence carries with it a significant period of incarceration, I usually did not make any recommendation to accept it or not.* Goldstein Letter, Exhibit 4 (Docket No. 24-4) to Boyle Decl. (Docket No. 24). Attorney Goldstein went on to say that as a result of what he termed "recent case law", he "now" (i.e., in 2002) makes a recommendation to aid the client with his decision. *Id.* (Docket No. 24-4).

As Petitioner argues, it is readily apparent from Attorney Goldstein's letter that at the time of Petitioner's trial in 1999, it was his practice to make *no* recommendation about a plea offer, irrespective of the strength of the prosecution's case, the availability of a defense, or the maximum sentencing exposure that the defendant could receive if convicted. Trial counsel's "'no advice' policy under the circumstances is tantamount to the absence of counsel." *Carrion*, 644 F. Supp.2d at 470 ("Under these unique circumstances, where nothing could be gained by proceeding to trial, counsel should have made an explicit recommendation to take the plea offer, at the very least. If Carrion declined to accept that advice, he would then have no one to blame but himself. Consequently, regardless of the sentencing exposure issue, I find that Carrion received ineffective assistance of counsel from Kulcsar with regard to the plea offer."). In failing to provide any "counsel" to Young regarding the plea offer, Young's trial attorney counsel failed to fulfill his duty "to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." *Von Moltke v. Gillies*, 332 U.S. at 721. Young has met the first prong of *Strickland* in that he has shown that trial counsel's performance fell below an objective standard of reasonableness. *Accord, e.g.*, *Carrion*, *supra*; *see also Boria v. Keane*, *supra*.

### 3.)    Reasonable Probability of a Different Result

Young now must clear the "prejudice" hurdle of the *Strickland* test, which requires demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005). In the context of a claim alleging

deficient assistance in connection with a plea offer, and the petitioner contends that he would have pleaded guilty if his counsel had urged him to do so, the petitioner must demonstrate that there is a "reasonable probability" that but for his counsel's professionally unreasonable advice, he would have admitted culpability and entered a guilty plea. *Purdy*, 208 F.3d at 49.

The state court alternatively held that even if an offer was conveyed, Petitioner could not establish prejudice under *Strickland's* second prong because he had maintained his innocence. However, while a defendant's assertions of innocence is one factor that a court may consider when determining if a defendant would have accepted a plea offer, it is not dispositive. *E.g.*, *Cullen v. United States*, 194 F.3d at 407. The fact that Young maintained his innocence in his pre-trial discussions with defense counsel does not defeat a finding that he was prejudiced by counsel's deficient advice–or rather, lack of any advice. "Though a claim that he would have accepted the plea would be self-serving (like most testimony by witnesses who are parties), it ought not to be rejected solely on this account."[2] *Cullen*, 194 F.3d at 407 ("In assessing Cullen's credibility, the fact-finder would be entitled, but not required, to consider Cullen's continued protestation of innocence as weighing against the credibility of his claim, and to regard the disparity between the guideline range he faced and the range as represented by defense counsel as another factor bearing upon his credibility, *see Gordon,* 156 F.3d at 381 (deeming disparity of

[2]      Juries are regularly given the following instruction concerning the testimony of a defendant testifying in a criminal case:

  In this case, the defendant decided to testify. You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of this case. You should not disregard or disbelieve his testimony simply because he is charged as a defendant in this case.

  1 L. Sand, et al., Modern Federal Jury Instructions ¶7.01 (instruction 7-4) (1998)

120 months predicted exposure versus 262-327 months actual exposure supportive of credibility)."); *accord Mask*, 233 F.3d at 142 ("The State also maintains that Mask's protestations of innocence indicate that it is unlikely that he would have agreed to any plea offer. This Court has previously stated such contentions of innocence by a defendant are not entirely dispositive.") (citation omitted).

A significant sentencing disparity in combination with defendant's statement of his intention to accept the plea bargain if he had received adequate counseling from his attorney is sufficient to support a prejudice finding. *Pham*, 317 F.3d at 182 (citing *Gordon*, 156 F.3d at 381; *Mask v. McGinnis*, 233 F.3d 132, 141-42 (2d Cir.2000) ("However, this Court in *Gordon* announced that 'a [great] disparity [between the actual sentence and the sentence that effective counsel would have secured for the defendant] provides sufficient objective evidence– when combined with a petitioner's statement concerning his intentions–to support a finding of prejudice under *Strickland*.' *Id*. at 381; *see also Cullen,* 194 F.3d at 407-08 (stating that disparity between actual sentence and sentence available through plea bargain is a factor in determining whether petitioner suffered prejudice)), *cert. denied*, 534 U.S. 943 (2001)). Both of these elements are present here.

With regard to Petitioner's averments in his affidavits about the plea offer and that he would have pleaded guilty had he been properly advised, Respondent argues that petitioner's affidavit should be discredited because the prosecution could not have made a "sentence" offer of seven years since it is the court, and not the parties that determines a sentence. However, "nothing in the standards established by the Supreme Court in either *Strickland* or *Hill* require an evaluation of whether the court would have accepted a different plea agreement." *Mask v.*

*McGinnis*, 233 F.3d 132, 142 (2d Cir. 2000) (citing *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct.

366, 88 L.Ed.2d 203 (1985) (stating that evaluation of likelihood that the result would have been

different but for counsel's ineffectiveness "should be made objectively, without regard for the

'idiosyncrasies of the particular decisionmaker.' ") (quoting *Strickland*, 466 U.S. at 695, 104

S.Ct. 2052).

Furthermore, I agree that Respondent's argument fails to take into account the realities of

typical, day-to-day criminal practice. Plea negotiations first involve discussions between the

parties. As Petitioner's habeas counsel points out, it is not unusual (at least in the New York

State system) for there to be an agreed-upon sentence if a plea agreement is reached. That

agreement is then presented to the trial court for its approval. In this case, however, it was never

presented to the court because an agreement between the parties was never reached. But that does

not mean that an offer involving a seven-year sentence was not conveyed or would not have been

approved if presented to the trial court.

Turning next to the issue of the disparity in sentence-length between the plea offer and

the potential maximum, Young's sentencing exposure in 1999 on the convictions for the class B

violent felonies was a minimum of 5 years and a maximum of 25 years. *See* N.Y. Penal Law §

70.02(3)(a). On the class C violent felony, he faced a concurrent sentence having a minimum of 3

1/2 years and a maximum of 15 years. Finally, on the class D felony, he was subject to a

maximum of 2 1/3 to 7 years, to be served concurrently. Thus, his potential aggregate maximum

was 25 years; he was actually sentenced to 20 years on the top counts (the B felony convictions),

with lesser concurrent sentences on the C and D felonies.

The most serious charges in the indictment, attempted murder in the second degree and

assault in the first degree, both Class B felonies under New York law, carry a potential

determinate term of imprisonment of 25 years. Young stated that the plea offer was 7 years;

Attorney Goldstein did not dispute that in his October 24, 2002 letter. Attorney Trott stated that

Young was offered a plea to "7, 10, or 12 years" imprisonment and he faced a maximum of 25

years if convicted on all counts. Even an offer of 12 years was a significantly less than the

potential 25-year maximum, and was an attractive option given the strength of the prosecution's

case. As noted above, Young actually received a sentence of 20 years in jail. The disparity

between the potential maximum sentence and the ten-year plea offer,[3] when considered with

counsel's admission that he made no recommendation and Young's sworn assertion that he

would have pled guilty had he been properly advised, demonstrates the prejudice required under

*Strickland*.  *Mask v. McGinnis supra*, *Cullen v. United States*, *supra*.

### 4.        Relief Under Section 2254(d)(1) and (2)

Having found that Young has satisfied *Strickland*, the Court must then conduct an

additional inquiry for "AEDPA . . . requires more than a conclusion that counsel's performance

was constitutionally inadequate." *Carrion*, 549 F.3d at 591 n. 4; *see also Schriro v. Landrigan*,

550 U.S. 465, 473 (2007). "[P]etitioner must identify some increment of incorrectness beyond

error in order to obtain habeas relief. That increment, however, need not be great; otherwise

---

[3]        The Court is convinced that there was a plea extended to Petitioner, although it recognizes that there is some uncertainty of the length of the sentence. Respondent has not adequately refuted the existence of a plea offer. The Court has selected ten (10) years as the length of the sentence, because it is the median value in the three possible sentence lengths recollected by Attorney Trott (seven, ten, and twelve). *See* http://en.wikipedia.org/wiki/Median ("In probability theory and statistics, a median is described as the numeric value separating the higher half of a sample, a population, or a probability distribution, from the lower half. The median of a finite list of numbers can be found by arranging all the observations from lowest value to highest value and picking the middle one.") (last accessed Feb. 17, 2011). The median is the "middle" value in a list of numbers; where, as here, the list contains an odd number of values, the median is truly the "middle" number, i.e., ten.

habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Jones v. West*, 555 F.3d 90, 96 (2d Cir.2009) (citations and internal quotation marks omitted). Under the circumstances, the Court finds that the state court's unreasonably applied clearly established Supreme Court law in concluding that trial counsel provided effective assistance with regard to the plea offer. First, this is not a case where trial counsel's advice about the wisdom of accepting a plea could be placed on a continuum of reasonableness because, as trial counsel admitted, he gave *no* advice whatsoever. The failure to give *any* advice was entirely contrary to the minimum professional norms of practice. Second, the judge's own statements on the record confirmed that there had been plea discussions between the parties, and Attorney Goldstein's letter did not deny that a plea offer had been extended. Thus, contrary to the judge's finding, there was independent evidence apart from Young's affidavit that a plea had been offered.

**B.  Ground Two: Ineffective Assistance of Trial Counsel – Failure to Demand Compliance with C.P.L. § 660.40**

Young contends that trial counsel was ineffective in waiving the prosecution's requirement under Criminal Procedure Law § 660.40 of submitting a written motion in order to obtain permission for a conditional examination of the victim, Brooks. The factual background to this claim is as follows.

On April 12, 1999, the prosecutor informed the trial court that the victim had undergone an operation on April 5, 1999, and was supposed be discharged "in the next few days". T.142. Two days later, on April 14, 1999, the prosecutor advised the court that he had discussed with defense counsel the possibility that the victim might not be able to testify in court. T.293. The

prosecutor further noted that he had informed defense counsel that he intended to file an application for a conditional examination of the victim pursuant to New York Criminal Procedure Law ("C.P.L.") § 660.40.[4] T.294. At that time, defense counsel informed the trial court that there was "no need" for the prosecution to file any motion papers as he "will consent to a videotape[d] examination." T.294.

On April 15, 1999, the trial court informed the parties that it had reviewed C.P.L. § 660.40 which requires a formal written application by the party seeking the conditional examination. Noting that defense counsel had waived the requirement of a written application, the court then asked the prosecutor about the nature of his application–that is, why the victim was unable to testify in court. T.501. The prosecutor noted that the victim had been confined to the hospital since the shooting had undergone several surgeries, the most recent of which had occurred on April 2, 1999. T.502. The prosecutor explained that he had visited the victim at the hospital the night before, and learned that the victim was confined to his hospital bed, was unable to tolerate solid foods, and would not be able to be released. T.503. Defense counsel then acknowledged that he had advised the prosecutor that he would consent to an oral application for a conditional examination of Brooks. He thereupon consented to the court's order permitting Brooks' to testify at the hospital and to have his testimony recorded on videotape for use at trial.

That afternoon, the attorneys, Petitioner, and the trial court were present at the Erie County Medical Center for the conditional examination of Brooks which was recorded on

---

[4]       C.P.L. § 660.40 provides that an application to examine a witness conditionally: 1) must be made ir writing, 2) contain a statement that there is reasonable cause to believe that grounds for  such an examination exist, together with allegations of fact supporting such statement, and 3) a copy of the application, with reasonable notice and opportunity to be heard, must be served on the other party. N.Y. CRIM. PROC. LAW §§ 660.40 (1)(b); (3)).

videotape in addition to being recorded stenographically. The examination was conducted before a judge and the witness was under oath. Defense counsel had the opportunity to prepare for cross-examination, and extensively cross-examined the victim recognizing that the examination was intended for introduction into evidence at trial. Brooks' videotaped testimony was later played for the jury. T.506-517, 547.

Young asserted this claim of ineffective assistance of trial counsel in his 2003 C.P.L. § 440.10 motion. In dismissing the claim, the trial court held that counsel's waiver of the written requirement for the application was not ineffective: Because the written requirement was purely statutory, and not of constitutional dimension, it could be validly waived by counsel. In the alternative, the trial court held that because counsel's waiver of the written-motion requirement and his failure to oppose the prosecution's request for a conditional examination, were matters of record, Petitioner should have raised this claim on his direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c); *People v. Cooks*, 67 N.Y.2d 100, 103 (N.Y. 1986). As Respondent points out, there is nothing in the record to suggest that appellate counsel was prevented from including this argument in the brief filed on appeal. In fact, appellate counsel did address the issue of the conditional examination by arguing that allowing the conditional examination under C.P.L. § 660.40 amounted to an invalid waiver of Petitioner's Sixth Amendment right to confront the witnesses against him.

As Respondent argues, this claim is subject to a procedural default due to the trial court's reliance upon an adequate and independent state ground to dismiss it, i.e., C.P.L. § 440.10(2)(c). The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default

will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations and internal quotations omitted). Even where the state court also considers a petitioner's arguments on the merits, that is of no moment because "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." *Harris*, 489 U.S. at 264 n. 10; *accord Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054 (1995).

A habeas petitioner can overcome the procedural default if he can "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice.'" *Harris v. Reed*, 489 U.S. at 262 (citations omitted); *accord*, *Schlup v. Delo*, 513 U.S. 298, 324-27 (1995); *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996), *cert. denied*, 520 U.S. 1108 (1997). To show a "fundamental miscarriage of justice" requires a demonstration of "actual innocence." *See*, *e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

Where the basis for a claim of ineffective assistance of counsel is well established in the trial record, a state court's reliance on C.P.L. § 440.10(2)(c) provides an independent an adequate

procedural bar to federal habeas review. *E.g.*, *Sweet v Bennett*, 353 F.3d 135, 140 (2d Cir 2003). Young cannot demonstrate cause and prejudice. Nor can he show that he is factually innocent. Accordingly, Ground Two is dismissed as subject to an unexcused procedural default.

### C. Ground Three: Verdict Against the Weight of the Evidence

Young contends, as he did on direct appeal, that the jury did not properly weigh what he characterizes as conflicting evidence in the case. First, Young argues that the jury failed to consider the discrepancy between Lemon's testimony that he saw defendant standing with another black male and the testimony of Stover and Lias that neither of them got out of the car that night. Young attributes this to Lemon testifying falsely.

Second, Young argues that the jury failed to accord the proper weight to the evidence that no gunshot residue was found on him, while such residue was found on Stover and Lias. Young concedes that since Lias testified he threw the gun out the window, it would account for the presence of residue on Lias. He argues that its presence on Stover cannot be explained unless Stover testified falsely concerning his participation.[5] Third, Young points to the apparent inconsistency between Stover's testimony that Lias threw the shells out the window during the car chase and Lias' testimony that he only discarded the gun.

Respondent argues that the weight-of-the-evidence claim presents only a matter of State law and therefore is not cognizable on Federal habeas review. I agree with Respondent. This claim derives from C.P.L. § 470.15(5), which permits an appellate court in New York to reverse

---

[5]     As Respondent points out, the evidentiary stipulation read into the record was that the results for gunshot residue as to Petitioner were "inconclusive". The inconclusive results could be explained by the fact that Young was wearing knit gloves which Lias testified that Petitioner tossed out the window during the car chase with the police. T.306. In addition, the presence of gunshot residue on Stover could have resulted from his handling of, or being in close proximity to, the discharged firearm; although there was no testimony that Stover handled the gun, he was a passenger in the car. T.545, 546.

or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). Whereas a legal sufficiency claim is based on federal due process principles, a "weight of the evidence" argument presents only a state law claim grounded in the criminal procedure statute. *People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987). Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Federal courts routinely dismiss claims attacking a verdict as against the weight of the evidence on the basis that they are not federal constitutional issues cognizable in a habeas proceeding. *Ex parte Craig*, 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923); *see also Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996) (dismissing habeas claim based upon the insufficiency of the evidence, stating that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal" and stating that it must defer to the jury's assessments of both of these issues).

For the foregoing reasons, Ground Three of the petition is dismissed.

> **D.** **Ground Four: Violation of Due Process – Failure to Disclose and Failure to Retain Exculpatory Evidence**

Young argues that the prosecutor withheld exculpatory material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), when he failed to turn over what Young characterizes as a "full and complete" copy of the gunshot residue report. He also asserts that his due process rights were violated by the prosecution's refusal to test certain items of clothing which allegedly would have yield additional exculpatory results. *See*, *e.g.*, *Arizona v. Youngblood*. Respondent argues that the *Brady* claim is contradicted by the trial record because the GSR test results were not "suppressed" and, in any event, is without merit. Respondent argues that the *Youngblood* claim is without merit.

### 1. Applicable Legal Principles

Under *Brady v. Maryland*, " the suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material" to the accused's guilt or punishment. 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (citing *Brady*, 373 U.S. at 87); *see also*, *e.g.*, *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

To satisfy its obligations under the Due Process Clause, the State must produce *Brady* material "in time for its effective use at trial[.]" *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008). *Brady* material that is "not disclosed in sufficient time to afford the defense an opportunity for use may be deemed suppressed within the meaning of the *Brady* doctrine." *Id.*

Even if evidence is material and exculpatory, it is not "suppressed" by the prosecution

within the meaning of *Brady* "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir 1982), *cert. denied*, 459 U.S. 1174 (1983) (citations omitted in *Zackson*)); *accord, e.g.*, *DiSimone v. Phillips*, 461 F.3d 181, 186 (2d Cir. 2006).

Relatedly, the prosecution also has a duty under the Due Process Clause to preserve exculpatory evidence that comes into its possession so that the defense may utilize it at trial. *E.g.*, *Arizona v. Youngblood*, 488 U.S. 51 (1988). The destruction or loss of exculpatory evidence rises to a constitutional violation where (1) the government must have acted in bad faith in destroying the evidence, *Arizona v. Youngblood*, 488 U.S. at 51; (2) the "evidence must possess exculpatory value that was apparent before it was destroyed," *California v. Trombetta*, 467 U.S. 479 (1984); and (3) the defendant must be "unable to obtain comparable evidence by other available means[,]" *id. See also United States v. Rasetelli*, 870 F.2d 822, 833 (2d Cir. 1989).

### a. The Gunshot Residue Test Results

As noted above in this Decision and Order in the section summarizing the trial, Detective Wilson of the Buffalo Police Department's Evidence Collection Unit retrieved a number of spent gun shells and a Smith & Wesson .44-Magnum revolver along the route followed by Petitioner's car during the ensuing police chase. After examining the revolver, he found no latent fingerprints. Detective Wilson also found no latent fingerprints in the Toyota automobile driven by Young on the night of the shooting. *See* T.398, 403, 413-414.

Before commencing his cross-examination of Detective Wilson, trial counsel advised the court that he was in possession of the gunshot residue report indicating that residue was found on

the hands of Young's cohorts, Stover and Lias. The report further stated that the test results with regard to Young's person were inconclusive. T.418. Trial counsel requested that he be allowed to cross-examine Detective Wilson regarding the gunshot residue report, notwithstanding that Detective Wilson had neither performed the gunshot residue report test and nor authored the report. T.418-423. Over the prosecutor's hearsay objection, the trial court permitted defense to cross-examine Detective Wilson about the report. An evidentiary stipulation concerning the contents of the report was read into the record. T.423, 545.

It was the prosecution's theory that petitioner Young was the only person who fired shots into Lemon's house at 18 Gray Street on November 7, 1998. Young's friends, Lias and Stover, who cooperated with the prosecutions, Stover testified that they heard shots within seconds after Young left the car after parking it across the street from Lemon's house. Both Lias and Stover testified that when Young returned to the car moments later he was carrying a gun. Lias and Stover insisted that it was only Young who had left the car that night even though Lemon that just moments before the shooting, he saw two men approach the house. At trial, the defense sought to argue that it was Lias or Stover who fired the shots that struck Brooks through the front window of Lemon's house.

Petitioner argues that this defense was undermined by the prosecution's incomplete disclosure of critical scientific evidence. With regard to the gunshot residue or GSR test results, Petitioner argues that because the prosecution belatedly informed the court that it was not going to call the laboratory representative who had performed the test, his prevented the defense from making effective use of the test results performed on the hands of petitioner, Stover and Lias.

On the third day of trial, defense counsel informed the court that he had just spoken with

Detective Wilson about a report received during pre-trial discovery indicating that swabbings had been obtained from the hands of petitioner Young, Lias, and Stover and submitted for gunshot residue (GSR) analysis. The report noted that there were particles present on both Stover and Lias were consistent with gunshot residue. There were no particles on petitioner Young's hands that were deemed unique to GSR. Wilson told counsel that while he performed the swabbings, the actual test was done, not by law enforcement, but by an outside agency. T.418-19. In response to the trial court's query, the prosecutor for the first time disclosed that the test was performed by the "R.J. Lee Group" a forensic laboratory in the State of Pennsylvania.

The prosecutor further stated that he had no intention of calling anyone from that laboratory, that the defense had obtained the report during pretrial discovery, and could have subpoenaed the lab's representatives. T.420. The defense responded, however, that its report simply identified a person "AJ Schwoeble, Manager," and in no way indicated that he was part of an independent agency and not part of the police department. T.421. Trial counsel then requested the opportunity to read the report's conclusions during Detective Wilson's examination. When the prosecution objected on hearsay grounds, the trial court responded, "[Assistant District Attorney] Mahoney, you certainly are a game player, sir[.]" T.421. The trial court later added that the report "is not favorable to your [i.e., the prosecutor's] case." T.422. The court ruled that the defense could question Detective Wilson about the foundational work he performed. The prosecutor was directed to produce the lab person the following Monday; otherwise, the defense would be permitted to read the test results into the record. T.423, 425.

The following Monday, the prosecution did not produce a representative from the lab. Accordingly the defense was forced to accept the court's offer of reading the GSR results from

the swabbings obtained from petitioner, Lias and Stover. The following was read into the record:

> Conclusion: Young, comma, Tamarr, there were no particles classified as unique to GSR detected in the sample set. It is termed inconclusive. This does not eliminate the possibility that the particles detected were the result of discharging a firearm, handling a contaminated weapon or being in the immediate proximity of a discharged firearm.
> Conclusion, Stover, comma, Pinky, the particles found on the hand samples of Pinky Stover could have resulted from the discharge of a firearm or from handling a contaminated firearm or being in close proximity of a discharged firearm or some other form of contamination.
> Conclusion: Lias, comma, Adrian, particles found on the hand samples of Adrian Lias could have resulted from the discharge of a firearm or from handling a contaminated firearm or being in close proximity of a discharged firearm or some other form of contamination.

T.545-46 (Copies of these pages are also attached to Boyle Declaration as Exhibit 1.)

Respondent argues that *Brady* was not violated because the defense received a full and complete copy of the gunshot residue report prior to trial. It appears that the defense received a complete copy of the test *results*, which was signed by the manager of the independent laboratory; however, it is unclear whether there were additional pages that contained information indicating the name of the laboratory for which the signing individual worked. Here, the prosecution did not alert the defense to the fact that it was tested by an outside laboratory. As the trial judge pointed out, that untoward gamesmanship on the part of the prosecutor. However, the issue is whether exculpatory evidence was withheld, and such was not the case here. Trial counsel did receive the test results in a timely fashion during pre-trial discovery, and thus the state court did not unreasonably conclude that the gun shot residue test results had been suppressed.

Petitioner argues that there was suppression because without the testimony of the laboratory technician to interpret them, the test results were only "marginally helpful" to the

defense. Petitioner argues that had the defense been aware that the tests were performed by an out-of-state private laboratory, it could have made arrangements to secure the testimony of the technician or request a court order that the prosecution to produce the technician. As noted above, the Court does not condone the prosecutor's gamesmanship, but it does not amount to "suppression" for *Brady* purposes. Because defense counsel had the report well before trial, and if he believed that cross-examination of the individual who performed the GSR testing, he could have checked with the prosecutor beforehand to ascertain whether he was going to call this "A.G. Schwoeble" and, if not, then defense counsel could have sought assistance from the court in securing A.G. Schwoeble's attendance.

For the reasons discussed above, Young has not demonstrated a due process violation with regard to the gunshot residue test results. Therefore, this claim does not provide a basis for habeas relief.

### b. The Clothing Taken From Petitioner, Lias, and Stover at the Time of Their Arrests

In addition to the swabbings from the three suspects' hands, the clothing they were wearing was sent for analysis to the same lab that performed the GSR tests. On cross-examination, Detective White testified that he did not know whether any results on the clothing had ever been received:

> Q. Did you do any testing of any of the clothing that was seized from any of the original defendants in this case?
> A. I didn't personally. That was all sent to the Erie County Police Services Forensic Laboratory for testing.
> Q. Was there a request for any specific testing on those items of clothing?
> A. I make specific requests such as blood trace, gunshot, whatever, and it's – they make the final determination as to what they test for.
> . . .

Q. In this particular case, did you get any results of testing dome on the clothing by the Forensic Services Lab?
A. I don't recall.

T.439-40. A sidebar immediately followed this testimony. Under questioning by the trial court, the prosecutor maintained that no tests were performed on the clothing but also acknowledged that no official report indicating that no testing had been conducted ever came back from the laboratory. T.443-44. Trial counsel did not press the issue regarding the clothing.

On direct appeal, Young presented this claim in his *pro se* supplemental appellate brief. The Appellate Division summarily denied the claim as without merit. Young's *pro se* brief was submitted by appellate counsel to the New York Court of Appeals with the leave application. See Letter Seeking Leave to Appeal, submitted as part of Respondent's Appendix of State Court Records. Accordingly, as Petitioner argues, the claim completed a full round of appellate review in the New York State courts and therefore is exhausted for purposes of 28 U.S.C. § 2254(b)(1).

Petitioner's habeas counsel asserts that "the GSR clothing report would be favorable evidence since it may materially contradict the prosecution's version of the events.") (citing *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) ("evidence is favorable to the accused if it either tends to show that the accused is not guilty or if it impeaches a government witness"). In her summation, the prosecutor attempted to explain the "inconclusive" GSR test results on Petitioner's hands asking the jury to infer that he wore gloves during the shooting, pointing to (1) Lias' testimony that Petitioner threw a glove out of the window during the chase and (2) police testimony that there were no fingerprints on the car's steering wheel. T.654-55. Petitioner points out that no glove was ever recovered and Lias' testimony contained statements that conflicted with other witnesses' accounts. Petitioner specifically notes that Lias denied handling any shells

-42-

and stated that he never got out of the car.[6]  Petitioner argues that had he able to show that his

outer clothing had no gunshot residue, the prosecutor's argument about a glove would have been

rendered irrelevant since if Petitioner fired a gun, as the prosecution claimed, it is likely that

some GSR would have been present on the sleeves of his outer clothing.

Petitioner contends that "[t]he loss and/or destruction of the clothing GSR test [sic]

satisfies the *Arizona v. Youngblood* factors. He further asserts that it was in bad faith because the

prosecution waited until trial to disclose the fact that tests were performed by an outside agency

thereby preventing the defense from subpoenaing and/or requesting the records earlier."

Petitioner argues that ""[t]he exculpatory nature of the reports would have been readily apparent

since it was the prosecution's claim that petitioner was the only shooter" and thus if there "was

no GSR on his clothing but GSR on Lias and/or Stover's clothing, that would be evidence that he

was not, in fact, a shooter."  Finally, Petitioner argues, "the evidence could not be procured

independently by the defense" because "[t]he clothing was in the exclusive possession of the

District Attorney and the test was performed by a lab that was under their control."

Although Petitioner couches this as a claim under *Youngblood* and *Trombetta*, it has not

been established the clothing evidence was lost or destroyed or in some other way subjected to

spoliation. *See*, *e.g.*, *Youngblood*, 488 U.S. at 48 ("We therefore hold that unless a criminal

defendant can show bad faith on the part of the police, failure to preserve potentially useful

---

[6]        The point about the shells is well taken; however, although Lemon testified that there were two
men on his front porch, he could not identify the man who was with Petitioner on the porch. Nor could Lemon
identify the men in the car.

evidence does not constitute a denial of due process of law.").[7]  Based upon this Court's review of the record, it appears that the clothing was not lost or destroyed; rather, the prosecution decided not to have any testing performed on it by the lab that did the GSR testing.

The Court does not believe it is accurate for Petitioner to assert that the defense could not have procured the items of clothing for independent testing because it was, Petitioner argues, in the "exclusive possession of the District Attorney and the test was performed by a lab that was under their control." Presumably, defense counsel was provided, during pre-trial discovery, with reports indicating what items had been seized from Petitioner and Lias and Stover at the time of their arrests–including their clothing, and the swab samples of their hands. There is no indication that defense counsel would not have been able to obtain access to these items so as to subject them to testing by a defense expert; however, it does not appear that the defense ever sought to do so.  "[T]here is no due process requirement that the government use any particular investigatory tool, including quantitative testing, to secure exculpatory evidence. Youngblood, 488 U.S. at 58-59 ("If the [lower] court meant . . . that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests.").

---

[7]  Although clearly not "established Supreme Court precedent" for AEDPA purposes, this Court finds more persuasive Justice Blackmun's dissent in *Youngblood*, the crux of which was his disagreement with limiting relief to such cases where the defendant can show "bad faith" on the part of the government. 488 U.S. at 62 (Blackmun, J., dissenting; joined by Marshall and Brennan, J.J.). Justice Blackmun agreed that "police action affirmatively aimed at cheating the process undoubtedly violates the Constitution" but balked the majority's suggestion that "this is the only way in which the Due Process Clause can be violated" for, "[r]egardless of intent or lack thereof, police action that results in a defendant's receiving an unfair trial constitutes a deprivation of due process." *Id.*

Under the circumstances, Young has not demonstrated a due process violation with regard to the items of clothing, whether the claim is analyzed under the rubric of *Youngblood* or *Brady*. *See*, *e.g.*, *Smith v. Edwards*, No. 98 Civ. 7962(DLC), 2000 WL 709005, at *6 (S.D.N.Y. May 31, 2000) ("Moreover, the absence of a *Brady* violation is particularly clear where, as here, the evidence was equally available to the defense, which chose not to pursue this course of investigation. *Cf. Morgan v. Salamack*, 735 F.2d 354, 358 (2d Cir. 1984) ["The evidence in question, which was not probative of appellant's innocence, was not in the prosecutor's file; nor was he obliged to seek it out or check the complainant's background for the indictment that he was prosecuting-it did not seem to the prosecutor to be particularly important for his case."]]. The rationale underlying *Brady* is that the defendant should not be denied access to exculpatory evidence only known to the government. *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993). *See also United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (no obligation to disclose exculpatory evidence "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence"). Defense counsel had knowledge of the semen samples and, as discussed above, strategically opted not to pursue DNA testing as a means of garnishing potentially exculpatory evidence. Smith is not therefore entitled to habeas corpus relief on this claim.").

For the reasons discussed above, Young has not demonstrated a due process violation with regard to the gunshot residue test results. Therefore, this claim does not provide a basis for habeas relief.

IV.    **Remedy**

Following *Boria,* I hereby order specific performance of the rejected plea offer of ten (10)

years with the goal of placing Young in the position he would have occupied had he accepted the offer to plead guilty. In this particular case, whether the sentence offer was seven, ten, or twelve years has become immaterial, because Young has already served over eleven years of his twenty-year sentence. Thus, giving Young the benefit of the plea deal, his sentence is reduced to a determinate of ten years-imprisonment. Therefore, I order that the sentence be reduced to time served and that Young be discharged. *Boarria*, 99 F.3d at 499. The judgment of conviction shall not be disturbed, as this Court has found that Young's trial was not marred by constitutional error that substantially prejudiced his right to a fair trial. *Id.*

## V. Conclusion

For the reasons set forth above, Tamarr Young's request for a writ of habeas corpus granted in part and denied in part. Habeas relief is granted with regard to Young's claim that he was denied the effective assistance of counsel during plea discussions. Young is hereby ordered discharged from Respondent's custody.

Because Young has failed to make a substantial showing of the denial of a constitutional right with regard to the remaining claims, *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

This judgment is not stayed pending the completion of appeal proceedings, if any.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:      February 17, 2011
                Buffalo, New York